**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANT:

**STEVEN E. RIPSTRA**
**MELISSA J. HALEY**
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE:

**PAUL SCHNEIDER**
DCS, Local Office in Dubois County
Jasper, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**FILED**

Feb 25 2013, 9:32 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
L.W., Minor Child, )
)
M.R., Mother, )
)
    Appellant-Respondent, )
)
        vs. )    No. 19A01-1208-JT-393
)
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE DUBOIS CIRCUIT COURT
The Honorable William E. Weikert, Judge
Cause No. 19C01-1207-JT-4

**February 25, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

M.R. ("Mother") appeals the involuntary termination of her parental rights to her child, L.W. Concluding that there is sufficient evidence to support the trial court's judgment, we affirm.

**Facts and Procedural History**

Mother is the biological mother of L.W., born in June 2009.[1] The evidence most favorable to the trial court's judgment reveals that in September 2010, the local Dubois County office of the Indiana Department of Child Services ("DCDCS") received a report of neglect alleging Mother used drugs in the presence of L.W. The referral further alleged that Mother had recently been admitted to a local hospital due to an overdose on prescription medication resulting from a suicide attempt. DCDCS initiated an assessment and located Mother at the hospital. After talking with Mother, caseworkers learned that she had knowingly ingested seven Flexeril, twenty Phenogrin, and thirty Klonopin pills in an attempt to commit suicide. Mother also admitted to recently using methamphetamine while supervising L.W., which was confirmed by hospital personnel when Mother's drug screen came back positive for methamphetamine and amphetamine. As a result of its assessment, DCDCS removed L.W. from the family home, placed the child in relative care, and filed a petition alleging L.W. was a child in need of services ("CHINS").

During a hearing on the CHINS petition in November 2010, Mother admitted to the allegations of the petition, and L.W. was so adjudicated. Following a dispositional hearing approximately one week later, the trial court issued an order formally removing L.W. from Mother's care and custody and awarding DCDCS with wardship of the child.

---

[1] L.W.'s biological father, K.W., voluntarily relinquished his parental rights at the commencement of the underlying termination hearing. Father does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

The court's dispositional order also directed Mother to successfully complete a variety of tasks and services designed to address her parenting and substance abuse issues and to facilitate reunification of the family. Among other things, Mother was specifically ordered to: (1) refrain from the use of all controlled substances and take only prescription medication as prescribed; (2) participate in a substance abuse assessment and follow all resulting recommendations; (3) submit to random drug screens; (4) obtain and maintain stable housing and employment; (5) exercise regular visitation with L.W. as directed by DCDCS; and (6) provide L.W. with a safe, secure, and nurturing home environment free from abuse and neglect. In January 2011, additional services were ordered by the trial court through a Parent Participation Plan ("PPP"), including individual therapy and Parent Aide Services to work on improving parenting skills, understanding child development, obtaining employment, and addressing addiction and mental health issues.

Mother's participation in court-ordered services was inconsistent throughout the CHINS case and ultimately unsuccessful. For example, Mother failed to achieve stable housing and bounced between living with family members, in shelters, and in various residential drug-treatment facilities. Although Mother obtained employment on several occasions, in each instance she left or was fired within weeks of starting her new job.

Mother also participated in several substance-abuse treatment programs, initially beginning treatment at Stepping Stones. Although she completed the program, there were on-going sobriety concerns and reports of substance use by family members. It was therefore recommended that Mother continue with out-patient therapy, as well as participate in both Alcoholics Anonymous and Narcotics Anonymous meetings. Mother

began living at the YWCA in early-December 2010, and entered an eight-month "Transition Housing Recovery Program" through the YWCA on December 29, 2010. Although maintaining sobriety was part of the rules at YWCA, Mother tested positive for opiate and oxycodone in December 2010. Mother also tested positive for oxycodone in January 2011, and received a written reprimand for failure to comply with other program guidelines in January 2011. On January 8, 2011, Mother violated the program's visitation policies by signing herself out and failing to return to the facility for two days. Mother then collected her belongings and left the YWCA program against the advice of staff on or about January 10, 2011.

In February 2011, arrangements were made for Mother to participate in a drug-treatment program at Ruth's House, an all-female, faith-based transitional home for recovering addicts. Ruth's House, however, requires that all residents be drug-free for thirty days before entering the program. Mother failed her drug screen and her admission to the program was delayed until March 2011.

While living in the structured environment at Ruth's House, Mother was able to make some progress in court-ordered services. She remained drug-free for approximately eight months and regularly participated in substance-abuse and individual counseling. Mother also exercised visitation with L.W. In October 2011, approximately six weeks before successfully completing the program, Mother voluntarily left the program against the advice of both Ruth's House staff and her DCDCS case manager. Although Mother had obtained independent housing after leaving Ruth's House with assistance from Aurora, a program that assists individuals with paying rent and utilities for a limited

4

amount of time, she was no longer participating in substance-abuse treatment or individual counseling. Mother's visitation with L.W. also became sporadic, and by late-January or early-February 2012, Mother began testing positive for drugs again. In addition, Mother was hospitalized in November 2011 and again in January 2012 for suicidal thoughts.

DCDCS eventually filed a petition seeking the involuntary termination of Mother's parental rights to L.W. in January 2012. An evidentiary hearing on the termination petition was held in June 2012. During the termination hearing, DCDCS presented substantial evidence establishing that Mother had failed to remedy the conditions that necessitated L.W.'s removal and continued placement outside of Mother's care. To that end, DCDCS presented evidence showing that, at the time of the termination hearing, Mother remained unemployed, had recently produced several positive drug screens, was likely going to lose her housing as funding from Aurora was due to expire, and remained incapable of demonstrating she was capable of providing L.W. with a safe, stable, and drug-free home environment. As for the child, DCDCS presented evidence showing L.W. had been living and thriving in pre-adoptive relative care with the child's maternal grandfather since February 2012.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In August 2012, the court entered its judgment terminating Mother's parental rights to L.W. Mother now appeals.

5

## Discussion and Decision

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Indiana Code section 31-35-2-8(c), the trial court's judgment contained specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Bester, 839 N.E.2d at 147. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)  that one (1) of the following is true:

  (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

  (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

  (iii)  The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)  that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[2]  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)).  "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship."  Ind. Code § 31-35-2-8(a) (emphasis added).  Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsection (b)(2)(B) and (C) of the termination statute cited above.

### I.  Conditions Remedied/Threat to Well-Being

Indiana Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B).  Because we find it to be dispositive, we limit our review to Mother's allegations of error

---

[2]  We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether DCDCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of L.W. outside Mother's care will not be remedied. On appeal, Mother argues that, at the time of the termination hearing, she was "making progress," albeit perhaps not exactly "as fast as [DCDCS] wished." Appellant's Brief at 16. Although Mother acknowledges that she "did not consistently have counseling" and "sought hospitalization for her suicidal thoughts" on two instances after leaving Ruth's House, was currently unemployed, and produced a positive drug screen as recently as April 2012, she nevertheless asserts she was "substantially compliant in her services and programs." Id. at 14, 16. Mother therefore contends that DCDCS failed to establish there is a reasonable probability that the conditions resulting in L.W.'s removal from her care would not be remedied, and, given "more time," her progress could continue. Id. at 17.

In its termination order, the trial court made numerous, detailed findings regarding Mother's history of substance abuse, housing and income instability, and failure to complete and/or benefit from the court-ordered reunification services. In so doing, the court specifically found that Mother "has not shown the ability to maintain appropriate, stable housing on her own and not to live with others as a dependent." Appellant's Appendix at 8. The court also found Mother "has not obtained full[-]time employment or obtained a steady, legal source of income," was either "fired" or "quit" each of the four jobs she did obtain during the pendency of the CHINS case, continued to make "impulsive decision[s]" throughout the underlying proceedings, and has "not shown

8

improvement or progress in the areas that were being addressed by the parent aid[e]," including substance use, decision making, and parenting skills. Id. at 8-9. Regarding Mother's struggles with substance abuse, the court found that Mother "has failed to successfully address her substance abuse issues." Id. at 10. Based on these and other findings, the trial court determined:

> [Mother] has made little progress in addressing her substance abuse, parenting skills, decision[-]making skills, mental health issues[,] or any other issues that led to [DCDCS] involvement. What little progress she did make, she was not able to maintain. She has failed to demonstrate that she has the necessary skills, knowledge[,] or abilities to provide for her child on a long[-]term basis.

Id. A thorough review of the record reveals that clear and convincing evidence supports the trial court's findings detailed above.

DCDCS case manager Terri Tigue-Petry ("Petry") informed the trial court that DCDCS's "main concerns" throughout the CHINS case revolved around Mother's "ability for self-sufficiency, to provide parenting [for L.W.], decision[-]making, impulse control, her addictions, and overall mental health." Transcript at 39. In recommending termination of Mother's parental rights, Petry further testified that there had "not been any consistency through this case as far as [Mother's] treatment and her parenting." Id. 39. Petry further informed the trial court that she had never been able to recommend placement of L.W. with Mother and that there "has not been any consistency in this case, other than the time frame at the Ruth's House." Id. at 54. In addition, Petry reported that during her last conversation with Mother in May 2012, Mother "admitted to losing the housing assistance" and "admitted to using meth." Id. at 65.

9

Petry's sentiments concerning Mother's lack of progress in services and failure to remedy the conditions which necessitated L.W.'s removal from Mother's care were echoed in the testimony of Ireland Home Based Services provider Kristen Harvey. Harvey likewise informed the trial court that Mother continued to make "impulsive" choices and decision-making throughout the CHINS case, such as when Mother decided to leave Ruth's House before successfully completing the program. Id. at 22. Harvey also acknowledged that Mother had been unable to maintain the progress she had made while in Ruth's House.

Mother's own testimony lends further support to the trial court's findings. During the termination hearing, Mother confirmed that she has had a "bumpy road" in dealing with her drug addiction. Id. at 85. Mother also acknowledged that her participation in counseling services and visitation with L.W. have continued to be sporadic after leaving the program at Ruth's House, and that she was currently unemployed.

As noted previously, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). After reviewing the record in its entirety, we conclude that clear and convincing evidence supports the trial court's specific findings set forth above. These findings, in turn, provide ample evidence to support the trial court's

ultimate decision to terminate Mother's parental rights to L.W. Mother's arguments to the contrary, emphasizing her self-serving testimony, rather than the evidence cited by the court in its termination order, amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265.

## II. Best Interests

We next consider Mother's assertions that DCDCS failed to prove termination of her parental rights is in L.W.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to L.W.'s best interests. Specifically, the court found that Mother was ordered to "work with therapists, parent aid[e], and [her DCDCS case manager] to develop a home environment and personal ability to provide safety, care[,] and acceptance of her child. [Mother] has been unable to do this." Appellant's Appendix at 9. The court further found that Mother "has not demonstrated an ability to provide for

11

herself and her child," and "continues to make impulsive decisions that are not in the best interest of [L.W.]." Id. at 10. Based on these and other findings, the trial court concluded that termination of Mother's parental rights is in L.W.'s best interests. These findings and conclusion, too, are supported by the evidence.

In recommending termination of Mother's parental rights, case manager Petry confirmed that L.W. was living with and "doing very well" in the care of the child's maternal grandfather. Transcript at 54. When asked to explain why she was recommending termination of Mother's parental rights as in L.W.'s best interests, Petry explained, "I believe that the pattern and the concerns with . . . with the mother, her overall decision-making, and her impulse control, place [L.W.] at risk." Id. at 52. Although Petry acknowledged that Mother loves L.W., she further testified that she did not believe Mother could provide L.W. with the "long-term permanency" that the child needs. Id. at 65. Moreover, in the court-appoint special advocate's (CASA) most recent report to the court, CASA Mary Young advised that L.W. had "adapted to the relative placement without any concerns" and "is very bonded to his caregivers." Dubois County CASA Report (filed 9-8-11), p. 3.[3]

Based on the totality of the evidence, including Mother's unresolved struggle with substance abuse, on-going housing and financial instability, and failure to benefit from court-ordered reunification services throughout the underlying proceedings, coupled with the CASA's report and testimony from case manager Petry recommending termination of the parent-child relationship, we conclude that there is sufficient evidence to support the

---

[3] The pages of the Volume of Exhibits submitted on appeal were not sequentially enumerated. We therefore cite directly to the CASA report.

trial court's determination that termination of Mother's parental rights is in L.W.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

This court will reverse a termination of parental rights '"only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made."' Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

BAILEY, J. and VAIDIK, J., concur.